**Justin Michael WOLFE, Petitioner,**

**v.**

**Harold W. CLARKE, Director, Virginia Department of Corrections,[1] Respondent.**

**Civil Action No. 2:05cv432.**

United States District Court, E.D. Virginia, Norfolk Division.

July 26, 2011.

---

1. Substituted for Gene M. Johnson, pursuant to notice dated January 18, 2011.

James Griffin, Alan Dial, Brian Meiners, King & Spalding, Washington, DC, Michele Jill Brace, Virginia Capital Representation Resource Center, Charlottesville, VA, Daniel James King, King & Spalding LLP, Atlanta, GA, for Petitioner.

Matthew P. Dullaghan, Steven Andrew Witmer, Office of the Attorney General, Richmond, VA, for Respondent.

### AMENDED MEMORANDUM OPINION AND ORDER

RAYMOND A. JACKSON, District Judge.

This matter is before the Court on Petitioner Justin Michael Wolfe's ("Wolfe" or "Petitioner") petition for habeas relief un-

der 28 U.S.C. § 2254. Petitioner alleges that he has been imprisoned in violation of his due process rights under *Brady v. Maryland* and *Giglio v. United States.* Petitioner further alleges that the trial court contravened the Sixth and Fourteenth Amendments by striking venireman Mock from the jury panel despite the fact that he was "plainly able and qualified to serve as a juror." *Wolfe v. Johnson,* 565 F.3d 140, 148 (4th Cir.2009). For the reasons stated herein, Petitioner's request for habeas relief is **GRANTED.**

## I. FACTUAL AND PROCEDURAL HISTORY [2]

On January 7, 2002, a Prince William County jury convicted Petitioner of capital murder (murder-for-hire), use of a firearm in the commission of a felony, and conspiracy to distribute marijuana. As a result of his convictions, Petitioner was sentenced to death on the murder-for-hire charge and prison terms of thirty years and three years, respectively, on the conspiracy and firearm charges. Petitioner filed an appeal in the Supreme Court of Virginia on the capital murder conviction[3] and filed an appeal in the Virginia Court of Appeals on the firearm and drug convictions. The non-death penalty cases were certified to the Supreme Court of Virginia and consolidated. The Supreme Court of Virginia dismissed the petition on March 10, 2005 and the United States Supreme Court denied Wolfe's petition for writ of certiorari on July 8, 2005.

On November 7, 2005, Petitioner filed his federal habeas petition under authority of 28 U.S.C. § 2254 ("§ 2254 claim"). On August 7, 2007, the Magistrate Judge issued a Report and Recommendation declining to conduct an evidentiary hearing and recommending that his petition be dismissed. On February 11, 2008, this Court adopted the Report and Recommendation and dismissed Wolfe's petition. Petitioner then filed a motion to alter or amend the judgment which this Court denied on May 20, 2008. On June 18, 2008, Petitioner filed his notice of appeal. On September 12, 2008, the United States Court of Appeals for the Fourth Circuit granted Petitioner a certificate of appealability on his extraneous influence, venireman, *Brady,* and *Giglio* claims. On May 11, 2009, the United States Court of Appeals for the Fourth Circuit affirmed the district court's rulings on the extraneous influence claim and the venireman-counsel subpart, and vacated this Court's ruling on the *Brady, Giglio,* and venireman-court subpart claims. *Wolfe v. Johnson,* 565 F.3d 140 (4th Cir.2009). Additionally, the United States Court of Appeals for the Fourth Circuit remanded the case for a determination under *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) and to decide whether an evidentiary hearing was appropriate. *Id.* On February 4, 2010, this Court issued a Memorandum Opinion and Order finding that Petitioner had satisfied the *Schlup v. Delo* standard to pur-

---

**2.** The factual and procedural history of this case has been well documented by the United States Court of Appeals for the Fourth Circuit in its opinion remanding these issues to this Court as well as this Court in its previous decisions. *See Wolfe v. Johnson,* 565 F.3d 140 (4th Cir.2009); *Wolfe v. Johnson,* No. 2:05–cv–432, 2008 WL 371117 (E.D.Va. Feb. 8, 2008). This Court will rely primarily on these recitations for the detailed factual and procedural history. However, for the sake of

clarity, the Court has provided a brief summary herein.

**3.** In its opinion, the Unites States Court of Appeals for the Fourth Circuit refers to the murder-for-hire charge/conviction as capital murder. For the purpose of these proceedings, these terms may be used interchangeably. *See Wolfe v. Johnson,* 565 F.3d 140 (4th Cir.2009).

sue his § 2254 claim. Furthermore, the Court granted Petitioner's Motion for an Evidentiary Hearing on his *Brady* and *Giglio* claims and reserved its ruling on Petitioner's venireman-court claim. The Court conducted an evidentiary hearing on Petitioner's *Brady* and *Giglio* claims on November 2, 2010.[4] At the conclusion of the hearing, the Court ordered both parties to submit proposed findings of fact and conclusions of law. Both parties submitted proposed findings of fact and conclusions of law on January 18, 2011.

On April 22, 2011, Petitioner also filed a Motion for Leave to Amend Petition for Habeas Corpus to include a new legal argument regarding key government witness, Owen Barber's, false testimony at trial. The Director filed a response in opposition to the motion on May 4, 2011; and Petitioner filed a reply in support on May 5, 2011. Having been fully briefed, these matters are now ripe for judicial determination.

## II. LEGAL STANDARD

Title 28 U.S.C. § 2254 states that "the Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

### A. Legal Standard under *Brady v. Maryland* and *Giglio v. United States*

██ The Supreme Court has held that both the withholding of exculpatory evidence from a criminal defendant by a prosecutor and the knowing use of false testimony violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Brady v. Maryland,* 373 U.S. 83, 86, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States,* 405 U.S. 150, 153–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. "Evidence is 'exculpatory' and 'favorable' if it 'may make the difference between conviction and acquittal' had it been 'disclosed and used effectively.'" *United States v. Wilson,* 624 F.3d 640, 661 (4th Cir.2010) (citing *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). For a court to find a *Brady* violation, it must determine that the evidence was 1) favorable to the accused, 2) suppressed by the prosecution (either willfully or inadvertently), and 3) material. *Banks v. Dretke,* 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004). Evidence that is favorable to the accused includes both exculpatory (whether requested by defendant or not) and impeachment evidence. *Id.;* *see United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (holding that the *Brady* rule includes impeachment evidence).

██ In analyzing materiality, courts must determine whether there is a "reasonable probability" that the result of the proceeding would have been different if the evidence had been disclosed. *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). This showing "does not require demonstration by a preponderance that disclosure of the sup-

---

4. The Court conducted a four-day evidentiary hearing, beginning November 2–3, 2010 and continuing on November 16–17, 2010.

pressed evidence would have resulted ultimately in the defendant's acquittal." *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Rather, a petitioner can fulfill the materiality standard by showing that the cumulative effect of the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." [5] *Id.* at 435–437, 115 S.Ct. 1555. This cumulative effect analysis emphasizes the fact that when making a materiality finding, courts should consider the suppressed evidence collectively, rather than judging the materiality of each item of suppressed evidence. *Id.* at 436, 115 S.Ct. 1555; *see id.* at 437, n. 10, 115 S.Ct. 1555 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for the purposes of materiality separately and at the end of the discussion.").

## B. False Testimony as Grounds for Habeas Relief

 Knowing use of false testimony violates due process. *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). This rule applies regardless of whether the false testimony is solicited, or merely allowed to stand uncorrected after it appears. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Non-disclosure of evidence affecting credibility also falls within this rule "when the 'reliability of a given witness may well be determinative of guilt or innocence.'" *Giglio*, 405 U.S. at 154, 92 S.Ct. 763 (quoting *Napue v. Illinois*). As with an alleged *Brady* violation, a finding of materiality is required to show that

"there is any reasonable likelihood that the false testimony could have affected the judgment of the jury" in order for a petitioner to receive habeas relief. *Id.*; *see Napue*, 360 U.S. at 271, 79 S.Ct. 1173. Courts have similarly concluded that petitioners may receive habeas relief based on the use of false testimony when a petitioner shows that government officers knew about the falsities in the testimony at the time of the trial; and, when there is evidence, such as a credible recantation, indicating that the testimony was in fact false. *Stockton v. Virginia*, 852 F.2d 740, 749 (4th Cir.1988).

## C. Dismissal of a qualified venireman for cause under *Witherspoon v. Illinois*

 Capital defendants have a right to a fair and impartial jury under the Sixth and Fourteenth Amendments. *Gray v. Mississippi*, 481 U.S. 648, 658, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). In ensuring this right, courts have held that a death sentence cannot stand when a trial court "excludes from a capital jury a prospective juror who in fact is qualified to serve." *Id.* at 650–651, 107 S.Ct. 2045. This rule includes veniremen who are dismissed for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *see also Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (holding that a venireman may be excused for caused based on his or her views on capital punishment if such views would "prevent or substantially

---

**5.** These materiality considerations place a responsibility on the prosecutor "to learn of any favorable evidence known to others acting on the government's behalf, including the police, and to gauge the likely net effect of all such [favorable] evidence" and make disclosure when the point of reasonable probability is reached. *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555.

impair the performance of his duties as a juror in accordance with his instructions and his oath"). When such violations occur, the court does not engage in an inquiry regarding the harm imposed by such error, but rather its findings immediately render the sentence imposed invalid. *Gray,* 481 U.S. at 668, 107 S.Ct. 2045 ("because the *Witherspoon–Witt* standard is rooted in the constitutional right to an impartial jury . . . and because the impartiality of the adjudicator goes to the very integrity of the legal system" harmless-error analysis cannot apply); *see Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976) (per curiam) ("[u]nless a venireman is 'irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings,' he cannot be excluded; if a venireman is improperly excluded even though not so committed, any subsequently imposed death penalty cannot stand.").

### III. FACTUAL FINDINGS

1. The prosecutors choreographed and coordinated witness testimony through a series of joint meetings with Owen Barber and J.R. Martin, Owen Barber and Jennifer Pascquierllo and Jason Coleman and Chad Hough.[6] Tr. 315; Am. Interr. Ans. at 3, 5; *see* Tr. 142 (providing Barber's testimony that Ebert wanted to ensure that the testimonies matched); *see also* Tr. 294 (providing Conway's testimony that the joint meeting between Barber and Martin was necessary to resolve a conflict in testimony and admitting that Barber conformed with Martin's recollection on at least one instance); Tr. 762 (providing Conway's testimony that he conducted a joint meeting with Coleman and Hough to discuss Hough's testimony regarding conversations with Wolfe).

2. At the time of the trial, the Commonwealth's Attorney's Office had a policy of putting exculpatory (i.e., *Brady* ) disclosures in writing. Tr. 75–76.[7]

3. The prosecutors did not provide any reference to or information regarding the joint meetings with witnesses in their written *Brady* disclosure. *See* Tr. 702–03; *see also* Resp. Ex. 1.

4. Sergeant Pass, lead officer of the drug investigation relating to Wolfe and Petrole, submitted reports outlining the investigation of Petrole and others' drug activities to both the prosecutors and homicide investigators. Tr. 384, 386. Conway did not review all of the reports dealing with the drug investigation and he did not provide them to Petitioner. Tr. 191–192.

6. The term "prosecutors" primarily refers to Commonwealth's Attorney Paul Ebert ("Ebert") and Assistant Commonwealth's Attorney Richard Conway ("Conway"). Ebert delegated most of the day to day prosecution of the case, to Conway. Conway also prepared the one formal *Brady* disclosure provided to Petitioner at trial.

7. During the habeas evidentiary hearing, Conway testified that he had discussions with Petitioner's trial counsel regarding other exculpatory information not disclosed in the written *Brady* disclosure. Tr. 292. The Court notes Conway's statements that he disclosed some exculpatory information to defense counsel in informal discussions. However, having observed Conway's live testimony and having reviewed the parties' filings and defense counsel's arguments at trial, the Court considers Conway's testimony with extreme skepticism. The Court finds it not only self-serving to make a blanket and non-specific statement that he made some disclosures in verbal conversations with defense counsel, but considering the proliferation of suppressed evidence in this case, the Court only consider's Conway's testimony reliable to the extent that it finds evidence proving disclosure in the trial transcripts.

5. Reports from the federal government (Department of Justice and Drug Enforcement Agency) regarding the parallel narcotics investigation were provided to the prosecutors in preparation for the trial. Pet'r's Ex. 30; Tr. 45 (confirming that the reports would have been part of the Commonwealth's' file "as a matter of practice"). Prosecutors reviewed these reports, but failed to include them in the *Brady* disclosure. Tr. 53 and 192.

6. The Prosecution failed to disclose Detective Newsome's report outlining his initial interview with Owen Barber on April 14, 2001, during which he implicated Wolfe as being involved in the murder before Barber mentioned his involvement. Pet'r's

Ex. 70 at 30–31 (report); Resp't Ex. 1 (Answer); Tr. 137.[8]

7. On November 2, 2010, while under oath before this Court, Owen Barber made a credible recantation of his trial testimony and indicated that Petitioner Justin Michael Wolfe was not involved in the murder of Daniel Petrole. Tr. 117.[9]

8. The Prosecution failed to disclose the tapes of multiple recorded meetings with key witnesses or the existence of such recordings to the Petitioner during trial. *See* Tr. 192; *see also* Tr. 554–55; Pet'r's Ex, 24.[10]

9. Prosecutors withheld evidence of Barber's personal dealings with the victim, including a claim that Barber owed Petrole

---

8. On May 4, 2001, Newsome submitted a narrative information report during which he describes his interactions with Barber during his initial arrest and transportation of Barber back to Prince William County. In the report, Newsome writes: "I told Barber that we knew he had killed Petrole ... but that he had killed him for someone else and we believed that person was Justin Wolfe." Pet'r's Ex. 70 at Prosecution 30. He then describes Barber's reaction: "He asked me, 'what do I get out of it if I tell you who the other person, the higher up, is?' " To which Newsome states, "I told him it could simply be the difference between Capitol [sic] murder or First Degree, execution or life in prison ..." *Id.* at Prosecution 30–31.

9. The Court notes that Barber's testimony on November 2, 2010, is consistent with another written recantation by affidavit which he executed on December 14, 2005 as well as his trial testimony describing how he shot Petrole after "he reached across for the glove box real quick ..." J.A. 1630; *see also* Tr. 160–61 (stating that the reason he shot Petrole was because "he reached for his glove box fast"). The Court also notes that his testimony is consistent with other exculpatory evidence withheld by the Prosecution in contravention of *Brady*. *See e.g.*, Pet'r's Ex. 70 at 30–31 (Newsome's report suggesting Wolfe as the "higher up" in the murder and indicating that implicating Wolfe could be the difference between "execution or life in prison"); Tr. 457–58, 460 (containing testimony from Jason

Coleman indicating that he told Ebert that Barber said he acted alone). In his habeas testimony, Barber also described that he lied about Wolfe's involvement because he wanted to avoid a capital murder charge. Tr. 138–40, 171. Specifically, he testified that Ebert, Conway, Mr. Pickett (Barber's attorney), Det. Newsome and Det. Walburn all indicated that he would face capital murder, and consequently the death penalty, if he did not cooperate and disclose the other participants. *See id.* This testimony is consistent with the suppressed report from Det. Newsome regarding his statements to Barber (during his transportation from California to Virginia) about Wolfe being involved in the murder and the importance of Barber's cooperation in avoiding the death penalty during Barber's transportation.

10. Aside from failing to disclose recorded interviews of key witnesses such as Owen Barber and Jennifer Pascquierllo, the prosecutors also withheld particularly relevant interviews of Walter Gunning (the victim's roommate and drug associate) from March 16, 2001, where he discussed drug associates and other potential persons that could have been responsible for the murder; and March 23, 2001, where he discussed the plan to cut another drug associate, Patterson, out of future drug transactions and the extent to which Patterson was aware of the plan.

money, a claim that Petrole had a hit out on Barber and a claim that Barber and Petrole had recently associated with each other socially. Pet'r's Ex. 41 (containing notes from an interview between a confidential informant and Detective Walburn stating: "Owen [Barber] owed Petrole money;" "Petrole had a hit out on Owen;" and that Petrole confronted Barber about the money owed and Barber refused to pay); Tr. 352 (stating that Jesse James knew both Petrole and Barber because they hung out at the same household as him in Chantilly, Virginia); Pet'r's Ex. 61 (indicating Randall Ketcham's statement that he had done ecstacy with Petrole and Barber).

10. The Prosecution withheld information indicating that Petrole was rumored to be an informant. Pet'r's Ex. 57; Tr. 687 (stating that Conway was aware of the rumor but failed to share the information because he did not have anything to substantiate it).

11. The Prosecution failed to disclose evidence that Mr. Petrole (the victim's father) was aware of the victim's drug activities and allowed Mr. Petrole's testimony to the contrary to remain uncorrected.

12. The Prosecution failed to disclose that their witness, Regina Zeuner, was a confidential informant. Tr. 765:13–24.

13. The Prosecution withheld evidence of prior inconsistent statements made by its own witnesses. Pet'r's Ex. 27 at Police–1175 (revealing Chad Hough's statement that he did not know who made the "do whatever you have to do" comment about robbing a drug dealer).

14. The Prosecution did not disclose its off the record agreement not to prosecute witness J.R. Martin for his participation in the murder based on his cooperation with the Commonwealth. Tr. 414.

## IV. DISCUSSION

Petitioner Justin Michael Wolfe seeks relief under 28 U.S.C. § 2254. In doing so, Petitioner asserts that the Commonwealth of Virginia ("Commonwealth") violated his due process rights under *Brady v. Maryland* and *Giglio v. United States.* Specifically, Petitioner asserts, *inter alia,* that the Commonwealth withheld potential impeachment evidence, evidence related to alternate theories of the crime, and other government reports and notes containing exculpatory information from him during the state court criminal trial proceedings. Petitioner also alleges that the Commonwealth knowingly provided false testimony or allowed false testimony to go uncorrected in violation of *Giglio* and *Napue v. Illinois.* Petitioner also asserts that the trial court violated his rights under the Sixth and Fourteenth Amendments by erroneously dismissing a qualified juror for cause. The Court will consider each of these assertions in turn.

### A. *Brady* and *Giglio* Claims

#### 1. *The Prosecution's Case*

In order to assess the implications of Petitioner's assertions and the Court's factual findings, the Court must first consider the Prosecution's theory of the case as presented at trial. The evidence presented at trial indicates that Petitioner, Justin Michael Wolfe, was a drug dealer in Northern Virginia. Petitioner dealt mostly with a high-grade marijuana, commonly known as "chronic," which the victim, Daniel Petrole supplied to him. Petitioner was close friends with another local drug dealer named Owen Barber. The Prosecution presented evidence that Petitioner arranged for Barber to rob/kill victim Petrole, who was Petitioner's drug supplier. More specifically, the Prosecution introduced testimony from Barber stating that he spoke with Wolfe about murdering his

drug supplier and that he met with Wolfe on the day before the murder to discuss the plan. On March 15, 2001, Owen Barber waited outside Regina Zeuner's apartment in Centreville, Virginia while the victim, Petrole, conducted a drug transaction with the Petitioner. Barber knew that Petrole was Wolfe's drug supplier and was aware of the transaction taking place after speaking with Wolfe on the phone. J.A. 1602. Barber then followed Petrole to his townhouse near Bristol, Virginia and fired ten rounds of ammunition through the passenger side of Petrole's vehicle, killing him. J.A. 563.

At trial, the Prosecution presented evidence, in the form of witness testimony, that Barber acted under a murder-for-hire scheme with Petitioner. J.A. 1687. Specifically, Barber testified that he agreed to kill Petrole for Wolfe in exchange for a half-pound of chronic marijuana, four pounds of lower grade marijuana ("schwag"), forgiveness of a $3,000 debt and $10,000 in cash. J.A. 1645. In an effort to link Petitioner to Barber, the Prosecution presented phone records from the Petitioner and Barber to show that they were in contact around the time of the murder. Barber's testimony provided the context for these phone calls as he described calling Wolfe while he was following Petrole to keep him abreast of the status of the pursuit. J.A. 1651–53. Petitioner presented a contrasting version of the events explaining that the phone calls and any other conversations were either in the normal context of their friendship (e.g., meeting up socially) or related to a drug transaction. See J.A. 2094–97. Motive then emerged as the critical factor on which the Prosecution based its theory of the case. The Prosecution argued that Barber would have no reason to kill Petrole, other than his agreement with Wolfe. The Prosecution further argued that Wolfe had motive to kill Petrole because: 1) he owed Petrole $60,000 and did not like paying his debts (J.A. 2175, 1463–64); 2) he wanted to make more money by decreasing the amount of chronic dealers (J.A. 577); and 3) Petrole was upset with him (Wolfe) for not paying down his debt (J.A. 2178).

The Commonwealth established their theory of the case through the testimony of several witnesses, primarily Owen Barber, Chad Hough, Jennifer Pascquierllo, Ian Wiffen and J.R. Martin. J.A. 2247 (identifying these witnesses as the individuals whose testimonies cast the most doubt on Wolfe's testimony that he had no involvement in the murder). Owen Barber provided the only evidence directly connecting Wolfe to the murder.[11] Despite the fact that the Commonwealth Attorneys, Mr. Paul Ebert ("Ebert") and Mr. Richard Conway ("Conway"), unapologetically employed an unusual practice of coordinating and choreographing the testimony of four of the five key witnesses,[12] the other testimonies primarily served to corroborate Barber's story, albeit often through rank speculation and double hearsay testimony. See e.g., J.A. 1758 (presenting speculation testimony from J.R. Martin that Barber did not tell him why he

---

**11.** The Prosecution has admitted that without Barber's testimony, Wolfe probably would not have been prosecuted on the murder charge. See e.g., Resp't Ex. 18 at 32 ("but for his [Barber's] testimony, Mr. Wolfe probably would not have been prosecuted").

**12.** The Court notes credible testimony from the evidentiary hearing that Ebert and Con-

way also held these joint meetings on occasion without the presence of witness' counsel. Tr. 416, 717 (disclosing an interview with Barber without his attorney); Tr. 761 (disclosing joint interviews including Coleman and Hough outside the presence of their known counsel).

killed Petrole but that it was "obvious" to him); J.A. 1874, 1877–79 (presenting double hearsay testimony from Jennifer Pascquierllo describing what Barber told her that Wolfe told him and other general hearsay testimony about what Barber told her); J.A. 1399 (presenting testimony from Hough stating that he did not know that Wolfe was involved in the murder and then speculating that "maybe it could be linked to somebody"); J.A. 1399–1400 (indicating that Hough was not sure about a connection and that he did not speak to his attorney until he spoke with Jason Coleman who stated that "he [Coleman] thought it could be linked").

The Prosecution also used circumstantial evidence such as phone records, private conversations between Barber and Wolfe, and facts indicating that Wolfe gave individuals such as J.R. Martin (person whose car was used for the murder) and Jennifer Pascquierllo (Barber's girlfriend) money during the aftermath of the murder to string together its theory of the case. While the Petitioner admitted many of these circumstantial facts in his own trial testimony (e.g., admitted to speaking with Barber on the phone throughout the night of the murder, admitted to being in debt to Danny Petrole, admitted to giving Pascquierllo money and posting her bond, admitted to giving Martin a discount on marijuana after he indicated that he knew what Wolfe had done), he has maintained his testimony that all of these acts occurred in the context of his drug conspiracy and not in relation to a murder-for-hire scheme. After hearing all of the evidence, a jury found Wolfe guilty on all three charges and recommended a sentence of death for the capital murder conviction.

### 2. Prosecution's suppression of impeachment evidence

### a. Evidence regarding Owen Barber's Relationship with Petrole

Most of the Prosecution's direct evidence came from the testimony of Owen Barber. J.A. 2530. During the course of Barber's direct examination, the Prosecution established the development and execution of the murder-for-hire agreement between Barber and Wolfe and its claim that but for Wolfe's request, Barber would not have killed Petrole. J.A. 1601–02. Notably, Barber testified that he did not know the victim,[13] thus allowing the Prosecution to establish its theory that Barber only killed the victim at the direction of Wolfe. See id. On cross-examination, Wolfe's counsel attempted to impeach Barber's testimony that he had no relationship with the victim, and therefore no other reason to kill him. J.A. 1691–93. Ultimately, Wolfe's counsel was unsuccessful in impeaching Barber's testimony and the jury convicted Wolfe of capital murder with Barber's testimony standing as the primary source of direct evidence.

■■ The post-conviction evidentiary hearing uncovered the fact that the Prosecution withheld exculpatory evidence from the Petitioner that could have assisted the trial counsel in impeaching Barber's testimony. First, this Court finds that the Commonwealth withheld information regarding the relationship between Barber and Petrole in violation of *Brady*. As indicated in the factual findings, Prosecutors were in possession of various forms of evidence indicating that Barber had a personal relationship with the victim prior to his death. This evidence included statements from a confidential informant that Barber owed Petrole money, that Petrole

---

**13.** Barber testified that he knew of Petrole from grade school, but that he had no rela-

tionship with Petrole in recent years or leading up to the time of his death.

had a hit out on Barber and notes from Detective Walburn (lead homicide detective) indicating that Barber was "tight" with the victim's roommate, Paul Gunning. Pet'r's Exs. 39, 41. The evidence also included a statement from Jesse James indicating that he, Petrole and Barber hung out at the same household (Tr. 352) and a statement from Randall Ketcham indicating that he had done drugs with Petrole and Barber (Pet'r's Ex. 61).

In finding that the Commonwealth failed to disclose evidence indicating that Barber had a relationship with Petrole, the Court considers the three factor *Brady* analysis. *See Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004). In this case, the evidence was favorable to Wolfe in that it would have impeached the key witness' testimony and possibly established an alternative motive for the crime. It was withheld from the Petitioner during trial as established by the fact that it was only submitted to Wolfe in the discovery ordered by this Court in its habeas inquiry as well testimony at the evidentiary hearing. Finally, as discussed in more detail below, the evidence was material because when combined with the circumstantial nature of the case and the importance of weighing Barber's credibility as the primary source of direct evidence, it reasonably undermines confidence in the verdict by contradicting a central aspect of the Prosecution's theory of the case (i.e., the idea that Barber did not know Petrole and would have no other reason to kill him). *See Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

### Confidential Informant's Statements about Barber and Petrole relationship

Respondent ("Director") characterizes the confidential informant's statements (as contained in Detective Walburn's notes) as rumor and speculation and asserts that the Prosecution's failure to disclose this evidence is not material because there was no evidence to corroborate the statements. Director's Proposed Findings of Fact and Conclusions of Law at 19–21. In *United States v. Moussaoui*, the United States Court of Appeals for the Fourth Circuit addressed a similar assertion, albeit outside of the *Brady* context. In *Moussaoui*, the court considered whether a defendant asserting his Sixth Amendment right to depose enemy combatant witnesses could rely on obviously inadmissible statements to show that the testimony of certain witnesses was material. The Government asserted that petitioners could rely only on admissible evidence to establish the materiality of witness testimony. *United States v. Moussaoui*, 382 F.3d 453, 472 (4th Cir.2004) (emphasis added). The United States Court of Appeals for the Fourth Circuit agreed that petitioners should not be allowed to rely on *obviously* inadmissible statements (e.g., statements of belief rather than personal knowledge); however, it expressly stated that "many rulings on admissibility ... can only be made in the context of a trial" and therefore cannot be meaningfully assessed outside of that context. *Id.* (also noting that statements that may not have been admissible during the guilt phase, may nonetheless be admissible during the penalty phase) (emphasis added). The court cited the Supreme Court's decision in *Wood v. Bartholomew* which held that inadmissible materials that are not likely to lead to the discovery of admissible exculpatory evidence are not subject to disclosure under *Brady*. *Id.*; *Wood v. Bartholomew*, 516 U.S. 1, 6, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995).

This Court emphasizes the Supreme Court's consideration of whether certain materials are likely to lead to the discovery of admissible exculpatory evidence in making its materiality findings. In dis-

cussing the confidential informant statements, Detective Walburn indicated that the statement that Petrole owed Barber money and the statement that Petrole had a hit on Barber were both pieces of information that the confidential informant said he had heard. Tr. 571–572. While the Director asserts that this type of testimony would not have been admissible at trial, this Court cannot state that such third party statements would be obviously inadmissible given the proliferation of other hearsay evidence that the Prosecution presented (and the trial court allowed) during Petitioner's criminal proceedings. *See Moussaoui*, 382 F.3d at 472. More important, had the statements been disclosed, the Petitioner would have had the opportunity to use the information to investigate alternate theories and discover other exculpatory evidence. Therefore, the Court finds that the confidential informant's statements should have been disclosed to the Petitioner under *Brady* because they are not obviously inadmissible given the context of the trial and because they would have likely led to other admissible exculpatory evidence had the Petitioner been afforded an opportunity to investigate the truthfulness of the statements.

### James and Ketcham's Statements about Barber and Petrole relationship

However, even if the Court assumes that the confidential informant's statements would not be admissible at trial, the Commonwealth's suppression of both Jesse James' and Randall Ketcham's statements undoubtably constitute a *Brady* violation. The Director again asserts that the Prosecution's failure to disclose the James and Ketcham statements is not material because the statements were speculative and lacked corroborating evidence. Director's Proposed Findings of Fact and Conclusions of Law at 19–21. However, both James and Ketcham made statements to the police based on their own experiences and knowledge. The Court also notes that the Prosecution's actions stifled any efforts Petitioner could have made to corroborate the statements. Furthermore, the Court finds no legal authority that indicates exculpatory statements must be corroborated before they can be considered as *Brady* evidence. To the contrary, the Court finds case law that indicates exculpatory evidence, particularly that which would be admissible at trial, should be provided to the defendant under *Brady. See Wood*, 516 U.S. at 6, 116 S.Ct. 7. Had the Commonwealth not suppressed this evidence, Petitioner would have been able to impeach the Government's key witness by calling both individuals as witnesses to directly refute Barber's testimony. The jury would have been allowed to weigh an admitted murderer's testimony (corroborated only by Martin, who provided him with a car on the night of the murder) against two other individuals that were wholly unrelated to the murder. The Commonwealth's suppression, therefore, undermines confidence in the verdict because it allowed Barber's testimony to stand unrefuted as opposed to providing not one, but two additional witnesses to challenge Barber's credibility. *See Monroe v. Angelone*, 323 F.3d 286, 315 (4th Cir.2003) ("A live witness directly contradicting [key witness'] testimony ... would have given the jury strong reason to doubt [key witness'] veracity. Significantly, the jury, had it been shown that a major prosecution witness was testifying falsely, is likely to have been more sympathetic to [defendant's] entire case"). Furthermore, if provided during trial, James and Ketcham's testimonies would have undermined the Prosecution's theory of the case because they would have challenged the notion that Barber did not have a personal relationship with Petrole and therefore had no other reason to kill him. *See*

*Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). For these reasons, the Court finds that the Commonwealth's failure to disclose this evidence meets the three factor test that the Supreme Court articulated in *Banks v. Dretke*. Hence, the Prosecution unconstitutionally withheld exculpatory evidence regarding Barber's potential relationship with the victim in violation of *Brady v. Maryland*.

### b. *Newsome's Interview with Barber*

■ Prosecutors also failed to disclose a report from Detective Newsome which contained Newsome's initial interview with Barber. Newsome told Barber the police knew that Wolfe was involved in killing Petrole. He also told Barber that implicating the "higher up" (i.e., Wolfe) could mean the difference between execution or life in prison. Pet'r's Ex. 70 at 30–31. This information is favorable to Wolfe because it documents the fact that detectives first mentioned Wolfe in connection to the murder and presented Barber with the option of execution or life imprisonment in exchange for implicating someone else, well before Barber began cooperating with the Commonwealth or implicating Wolfe in the murder. Prosecutors do not dispute the fact that the report was not provided to the Petitioner. Furthermore, the report is material because it reflects that Barber had a motive to misrepresent the facts regarding Petrole's death.

### c. *Barber's statement that he acted alone*

■ The Prosecution also withheld evidence indicating that Barber told his roommate, Jason Coleman, that he acted alone on the night of Petrole's murder. During the evidentiary hearing, Coleman testified that he had a conversation with Barber after the murder where Barber admitted to him that he murdered Petrole

and acted alone. *See* J.A. 456–61 (recounting the conversation with Barber and Coleman's disclosures to the prosecutors and investigators regarding what Barber had told him). This evidence is favorable to Wolfe because it is a prior statement from the shooter indicating that he [the shooter] did not act in concert with another person, let alone Wolfe. It is material to the case because it is important impeachment evidence. In fact, during the criminal trial, Wolfe's counsel cross-examined Barber regarding his conversation with Coleman on the Sunday after police first questioned him. *See* J.A. 1701–02. In an attempt to uncover more information about Barber's actions and admissions after the murder, Wolfe's trial counsel asked Barber, "what did you say to him [Coleman]" to which Barber responded "I can't recall." J.A. 1703–04. Counsel then followed up with the question "you're about to take off running from the police and you don't remember what you said" and Barber responded, "no." J.A. 1704. Had the Petitioner been in possession of this information, he would have been able to impeach Barber on his allegations regarding Wolfe's involvement or seek to refresh his recollection, based on a conversation that he admitted having with Coleman.

Although this evidence is both favorable and material, the Director disputes the allegation that the Commonwealth withheld it. Coleman testified that he told Ebert that Wolfe was not involved in the murder during a meeting held the week after the murder. Tr. 463. The Director asserts that Coleman never told prosecutors or police that Barber acted alone. Director's Proposed Findings of Fact and Conclusions of Law at 7. In support of this notion, the Commonwealth notes that both Ebert, Conway and Det. Walburn's testimonies suggest that Coleman did not make the statement. Tr. 790 (containing

Ebert's testimony that Coleman did not make that statement, Tr. 550 (containing Det. Walburn's denial that Coleman made that statement), Tr. 693 (containing Conway's denial that Coleman made that statement). During the evidentiary hearing, the Commonwealth attempted to buttress this position by asking Sgt. Pass, Det. Moore and Det. Newsome whether they remembered Coleman making that statement during their own separate interactions with him. Both Sgt. Pass and Det. Newsome indicated that they did not recall Coleman making that statement and Det. Moore indicated that Coleman did not make the statement in front of him (yet conceded that he was not in all of the interviews conducted by Det. Walburn). See Tr. 551, 534, 668 (containing Det. Moore, Det. Pass and Det. Newsome's testimonies, respectively, regarding their recollection of Coleman's statement).

During the evidentiary hearing, Coleman testified that he told Ebert that Wolfe was not involved in the murder and he testified that he believed that Sgt. Pass was also in the room.[14] During the evidentiary hearing, Sgt. Pass stated that he did not remember Coleman making the statement that Barber acted alone. Tr. 534. He did not state unequivocally that Coleman did not make the statement. The Court had an opportunity to examine Coleman on the stand and recalls his unequivocal testimony indicating that he told Ebert about Barber's statement and describing the circumstances under which he told him. Tr. 458. The Court finds Coleman's testimony to be credible. In light of Cole-

man's testimony, the Court concludes that the Commonwealth suppressed exculpatory evidence in violation of *Brady* by not disclosing the fact that Barber told Coleman he acted alone in committing the murder to the Petitioner during the trial phase.

#### d. *J.R. Martin*

█ In addition to the suppressed evidence relating to Owen Barber, the Prosecution also withheld exculpatory evidence relating to J.R. Martin, a prosecution corroborating witness. Martin was a close friend of Barber and provided him with a car to use on the night of the murder. After Barber testified, the Prosecution called Martin to corroborate Barber's testimony. Having had his testimony coordinated in a joint meeting with prosecutors, Martin provided testimony very similar to Barber's testimony. Martin admitted to being friends with and getting drugs from both Barber and Wolfe. J.A. 1730, 1733–34. He corroborated Barber's testimony that Barber had private conversations with Wolfe before the murder (at Back Yard) and after the murder (at Bridges), although he could only speculate about the content of the conversations. J.A. 1740–42, 1759. While corroborating other facts relating to Barber's actions, Martin also testified that Wolfe told him not to say anything [about what happened] and that he [Wolfe] commented that he was about to make a lot of money. J.A. 1760.

Wolfe's counsel was unable to effectively impeach Martin's testimony because the

---

14. The Court notes the Director's argument referencing Petitioner's Exhibit 24 and asserting that Coleman must have made the statement to Ebert on March 22, 2001 because that was the only meeting between Ebert and Coleman within the time frame that Coleman stated (as recorded by Det. Walburn). However, during the evidentiary hearing Coleman testified that he had many conversations with

Ebert regarding what happened on the night of the murder. Tr. 457. This testimony contradicts the Director's argument that Coleman only met with Ebert two times. Director's Proposed Findings of Fact and Conclusions of Law at 7. Therefore, the Court does not discount the fact that Coleman and Ebert may have spoken outside of the formal meetings noted by Det. Walburn.

Prosecution withheld an off the record agreement not to prosecute J.R. Martin if he cooperated with the Commonwealth. The information was suppressed during the trial phase because the presence of this agreement was only discovered during this Court's habeas hearing. During the evidentiary hearing, Martin's attorney, Robert Horan, testified that months into the investigation, the Prosecution indicated to him that Martin would not be charged if he cooperated with the Commonwealth. Tr. 414. When the Court explicitly asked him whether he had an off the record "gentleman's agreement" with the prosecutors, Horan initially responded, "no." However, he quickly clarified that response and admitted that while there was no agreement during the initial meetings, one later took form. Tr. 414. The fact that Horan turned over attorney-client privileged information during the course of police interrogations further supports the existence of an oral off the record agreement. Tr. 418–20; Pet'r's Ex. 29 at Prosecution 466.

The Director alleges that this information was never withheld from the Petitioner during trial because no such agreement existed. Director's Proposed Findings of Fact and Conclusions of Law at 4 (citing testimony from Martin denying that an agreement existed (Tr. 633–35, 655–56) as well as similar testimony from the Prosecutors (Tr. 286, 708, 820)). The hearing testimony confirms that the Prosecution never executed a *written* agreement not to prosecute Martin. However, the Court finds Mr. Horan's testimony regarding an understanding not to prosecute that emerged months after the investigation began and before Martin testified at trial to be credible and persuasive; this is particularly so, considering Horan's willingness to provide attorney client privileged information to the police prior to the trial.

This evidence qualifies as impeachment evidence worthy of *Brady* disclosure because it reveals a potential source of bias of the witness in favor of the Commonwealth's case (i.e., if the witness would not be prosecuted for his crimes, he had more incentive to cooperate with the Government and provide testimony consistent with their theory of the crime). *See United ed States v. Shelton*, 200 Fed.Appx. 219, 221 (4th Cir.2006) (stating that a defendant has the right to cross-examine witnesses about potential sources of bias under the Confrontation Clause); *see also United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (indicating that evidence used to impeach a Government witness qualifies as favorable for the purpose of *Brady* inquiry).[15] Further-

15. In *Williams v. Taylor*, the United States Court of Appeals for the Fourth Circuit considered the question of whether the state's suppression of an informal plea agreement constituted a *Brady* violation. In *Williams*, the United States Court of Appeals for the Fourth Circuit held that there was no *Brady* violation because 1) there was evidence that no such agreement existed and 2) defendant could not show materiality. The case at bar warrants a different conclusion than *Williams* because it is distinguishable on several important points. First, in the instant case, Martin's lawyer testified that he had an understanding that his client would not be prosecuted if he cooperated with the Common-

wealth. This differs from *Williams* where both the prosecutor and witness' lawyer stated unequivocally that no agreement existed. *Williams v. Taylor*, 189 F.3d 421, 428 (1999) (finding that there was unrefuted evidence indicating that an informal plea agreement did not exist at the time of the witness' testimony). The instant case is also distinguishable from *Williams* on materiality. In *Williams*, the United States Court of Appeals for the Fourth Circuit held that even if an informal agreement existed, defendant could not show materiality because he had already testified that he was at least an accomplice in the rape of one victim and that he shot the other in the head. *Id.* at 429. In the instant

more, it is material because it calls into question a key corroborating witness' motive for testifying at trial. Put in the appropriate context, Martin was not simply another corroborating witness. Rather, he was the person who provided the car that Barber used to commit the murder;[16] the first person to see Barber after he committed the murder; the first person to whom Barber confessed committing the murder; and the person who was present to observe the meetings between Barber and Wolfe after the murder. During cross-examination, Wolfe's counsel asked Martin whether he was facing charges; however, without knowledge of the informal agreement, Petitioner's trial counsel could not fully probe the scope of the witness' cooperation and arrangement with the Commonwealth.[17] See J.A. 1805. At trial, Martin testified that the only deal he had with the Prosecution was that they would not use his truthful statements against him. J.A. 1780–81. While the jury had some impeaching testimony available to determine Martin's credibility, the Prosecution deprived the jury of an opportunity to fully assess the Martin's potential bias by failing to disclose its off the record agreement not to prosecute Martin.

In light of the importance of Martin's testimony as corroboration for Barber's account of the events and given the Petitioner's inability to fully cross-examine

Martin with all of the impeachment evidence available, this Court finds that the cumulative effect of the Prosecution's suppression of the existence of the informal agreement, combined with the circumstantial nature of the case and the impact of other withheld impeachment evidence, undermines confidence in the verdict. Having considered all of these factors, the Court finds that the Prosecutors unlawfully withheld impeachment evidence from the Petitioner in violation of *Brady*.

### e. Chad Hough

■ Petitioner asserts that the Prosecution also withheld impeachment evidence regarding Chad Hough in violation of *Brady*. During Petitioner's trial, the Prosecution used Hough's testimony to corroborate Barber's account of the murder for hire plot. Hough testified that at various times, he discussed the idea of robbing drug dealers with Jason Coleman and Petitioner Wolfe. More specifically, Hough testified about one particular conversation with Coleman and Wolfe where Wolfe advised him to "do what you have to do" if things went wrong during the course of a robbery. J.A. 1395. On cross-examination, Petitioner's trial counsel attempted to impeach Hough's testimony with the limited information available to him. He asked about Hough's steroid use with Jason Coleman (J.A. 1408), he inquired about whether Hough took the robbery conversa-

case, Wolfe testified at trial that he was in no way involved in Petrole's murder or any murder for hire scheme with Barber. In light of Wolfe's testimony at trial, the impeachment of a key corroborating witness would likely have impacted the outcome of the trial when considered with the totality of the suppressed evidence.

16. At the trial, Martin admitted that he allowed Barber to borrow his car on the night of the murder after Barber pulled out a gun and told him that he was going to shoot someone in the knee-caps. J.A. 1790.

17. Defense counsel also tried to impeach Martin during cross-examination on the basis that his testimony only became consistent with Barber's on certain points after the Prosecutors conducted a joint meeting at the Commonwealth Attorney's office. J.A. 1789–90; see also Tr. 1788–89 (providing Martin's testimony that Barber had a different recollection of whether Martin knew that Barber was going to shoot/kill someone and indicating that the inconsistency was resolved after Mr. Conway interjected with a suggestion on how to harmonize the story).

tions seriously (J.A. 1412–13) and he inquired about Hough's impending drug charges. However, he was unable to cast doubt on Hough's credibility surrounding the drug robbery statement.

Discovery during this habeas action revealed a prior conversation with the Commonwealth during which Hough made inconsistent statements regarding his exchange with Wolfe and Coleman. During a December 5, 2001 taped interview in the Commonwealth Attorney's office (in the presence of Conway, his attorney and Detective Walburn), Hough stated that he remembered the comment "you [have] to do whatever you [have] to do" and explicitly stated that he did not recall exactly who made the comment. Pet'r's Ex. 27 at Police 1175. However, the Prosecution did not turn over the recording of the interview. *See* Tr. 192, 554, 555. They also failed to disclose this inconsistent statement in the written *Brady* disclosure which summarized information from each witness the Commonwealth interviewed. Resp. Ex. 1 at Prosecution 330. Rather, at trial, the Prosecution led Hough's testimony by asking what the *Defendant* told him to do and then allowed Hough to attribute the comment to Wolfe despite Assistant Commonwealth Attorney Conway being present in the interview when Hough made the prior inconsistent statement. *See* J.A. 1395.

This information is favorable to Wolfe because it provides a basis upon which to impeach a corroborating witness' testimony that attributes a potentially damaging statement to the Petitioner. Had Wolfe's counsel known about the prior inconsistent statement, he could have challenged Hough's testimony with his own statements. In a case based primarily on circumstantial evidence, impeaching one of the Commonwealth's key corroborating witnesses would have likely impacted the outcome of the trial. When evaluated for cumulative effect, it provides yet another example of the Prosecution withholding valuable impeachment testimony regarding its five key corroborating witnesses. The Commonwealth's *Brady* violations constrained the Petitioner's ability to fully cross-examine at least three of the five key witnesses in this case (including Barber who provided the only direct evidence in the case). In light of these facts, considered cumulatively with other evidence in the case, the Court finds that the Prosecution unconstitutionally failed to disclose Hough's prior inconsistent statement in violation of *Brady*.

3. *Prosecution's suppression of evidence undermining its theory of the case*

■ Petitioner further alleges that the Commonwealth withheld evidence of alternate theories of the crime. Pet'r's Proposed Findings of Fact and Conclusions of Law at 11. Specifically, Petitioner alleges that the Prosecution withheld the following exculpatory evidence: 1) drug investigation reports revealing conflicts in Petrole's drug enterprise; 2) statements indicating that Petrole was rumored to be an informant; and 3) witness statements indicating that a second car was at the crime scene shortly after the murder. The Court will address each alleged suppression in turn.

First, Petitioner alleges that the Commonwealth suppressed the government reports about the parallel drug investigation accompanying the investigation of Petrole's murder. Specifically, Petitioner asserts that prosecutors suppressed a DEA report by TFO S.M. Straka and Sgt. Pass (Pet'r's Ex. 30), an email indicating that one of Petrole's suppliers accrued charges at a local hotel days before the murder

(Pet'r's Ex. 40), a report narrating an interview with Jennifer Scott (victim's girlfriend) indicating that one of the victim's drug associates was aware that he was cut out of a deal (Pet'r's Ex. 54), and a transcript of an interview with Gunning (victim's roommate) outlining the victim's recent drug associations and operational conflicts in detail (Pet'r's Ex. 55). During the habeas evidentiary hearing, Attorney Ebert admitted that the Commonwealth produced the interview with Paul Gunning (victim's drug associate and roommate) particularly for the habeas proceeding. Tr. 44 (referring to Petitioner exhibit 55 containing transcripts from a March 16 police interview with Gunning). At the evidentiary hearing, both of the prosecutors (particularly Conway in his capacity as lead prosecutor on the case) and Sgt. Pass (head of drug investigation), testified that each of these items was part of the Prosecution's file during the state trial phase. *See e.g.*, Tr. 52–53 (containing Ebert's testimony about the DEA report). Conway then acknowledged that the Commonwealth's written *Brady* disclosure did not include any of these documents.[18] The Court, therefore, finds that the Commonwealth suppressed these materials during the trial phase.

Despite the fact that Wolfe faced both murder and drug conspiracy charges at trial, Mr. Conway testified he that did not review all of the reports related to the "separate" drug investigation in preparation for Wolfe's criminal trial.[19] Tr. 191–92. However, later in his testimony, Conway admitted that there was communication back and forth between the drug and homicide investigations and further stated, "I understand that we are charged with information that came through either." Tr. 272. Conway then testified that it was the Commonwealth's theory of the case that Petrole's death was a result of his drug activities. Tr. 273. The Court finds the Commonwealth's admissions in and of themselves to be indicative of a *Brady* violation. The Supreme Court has clearly stated that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Conway's evidentiary hearing testimony reveals a failure to uphold his duty as a prosecutor to learn of the favorable evidence known by government actors. Naturally, if a prosecutor fails to uphold the Supreme Court's mandate to simply review his files to learn of any favorable evidence known by government actors, the prosecutor cannot feign surprise when he violates a defendant's due process right by failing to disclose the same evidence that he could not bring himself to review.

18. Ebert testified that it was the Commonwealth's Attorney office's pattern and practice to make written *Brady* disclosures. *See* Pet'r's Exs. 42–50. At no point did the Commonwealth assert that this information was provided to the Petitioner outside of the written disclosure.

19. Conway characterized the investigation of Petrole, Wolfe and others' drug activities as "separate" from the homicide investigation. However, this distinction is precarious in light of the fact that Wolfe faced a drug conspiracy charge and a murder charge in the same trial. While there were in fact individual inquiries, the Commonwealth acknowledges the fact that the two investigations were interconnected and that the drug investigators remained involved in the homicide investigation. Tr. 47 (stating Ebert's testimony that the investigations were interconnected). *See also* Tr. 61 (admitting that Sgt. Pass worked for the Prince William Police Department and was "certainly part of a law enforcement agency"); Pet'r's Ex. 24 (showing that Sgt. Pass was present in 21 witness interviews relating to the murder investigation, often times along with Det. Walburn).

These facts are particularly troublesome in light of the fact that the Commonwealth's whole theory of the case was that Wolfe hired Barber to kill his drug supplier because he owed him money and wanted to decrease market competition. At the least, Conway's failure to even review all of the files, let alone turn them over, further supports this Court's finding that these materials were suppressed at the trial phase.

■ The Court further finds that the drug investigation reports and interviews were not only suppressed but were also favorable to the Petitioner. Each of the documents reveals aspects of Petrole's drug operation that call into question the Prosecution's theory that Wolfe was the person who orchestrated Petrole's murder. In addition to casting doubt on the Prosecution's theory of the case, the suppressed evidence points to other named individuals with motive to kill Petrole. Thus, in the hands of competent defense counsel, the evidence could have been used to either cast reasonable doubt on the Prosecution's theory of the case, establish a defense strategy pointing to other suspects, or impeach witness testimony. For example, the suppressed Drug Enforcement Administration report ("DEA report") summarizes Gunning's description of Petrole's drug operation. It names other drug suppliers, describes Petrole's various trips to purchase drugs, outlines the prices that Petrole charged for his drugs, and specifically discloses intermediaries' commissions for helping Petrole secure his drug supply. Gunning also described a potential conflict in Petrole's drug operation that stemmed from a recent decision to cut one intermediary, Brandon Patterson, out of a deal between Petrole and his major supplier of high-grade marijuana, Bill Hemenway. Pet'r's Ex. 30 at Prosecution 2027, 2029 (stating that Patterson would charge a commission of $500–$600 per pound). In addition to evidence indicating that there was a conflict between Patterson and Petrole, the Government also had information indicating that Patterson (who lived in Washington State) was in the Northern Virginia area just a few days before the murder. Pet'r's Ex. 40 (containing Trish Harman's August 20, 2001 email to Det. Walburn and Sgt. Pass stating that subpoena information of Patterson's bank account indicated that he was in Northern Virginia at the Dulles Hyatt "just days before Petrole's murder"). Petrole's girlfriend, Jennifer Scott, then confirmed that Patterson became aware that he had been cut out of a recent deal. Pet'r's Ex. 54 at Police 899. She also told the police that Petrole had become worried and was concerned that something bad would happen as a result of cutting Patterson out. *Id.* All of this information is favorable to Wolfe because it shows that there were conflicts in Petrole's drug operation that could have created motive for Petrole's death without Wolfe being involved.

Additionally, the information is material to the case because it undermines the Government's theory that Wolfe was the only person with motive to harm Petrole. Equipped with this information, a competent defense counsel could have impeached witnesses who suggested that Petrole had no enemies; developed a defense strategy that implicated Petrole's other drug associates (e.g., Patterson) in the murder rather than Wolfe; and/or called Gunning to the stand to inquire about the conflicts in the drug operation and then called Jennifer Scott to corroborate Gunning's testimony. The Petitioner also could have called Scott to testify about the fact that Petrole expressed a fear that something bad was going to happen as a result of Patterson being cut out of the deal. Even if Gunning denied his own statements at trial, competent defense counsel could have used the

DEA report and other suppressed items to impeach Gunning on the stand, thus calling into question the credibility of another government witness. When considering the cumulative effect of all of the suppressed evidence, the jury would have been able to consider a properly impeached key witness (Barber) combined with direct evidence implicating an alternative theory of the case (namely conflicts in the drug enterprise wholly unrelated to Wolfe), as well as other evidence impeaching the corroborating witnesses' version of events at trial. The fact that the jury was never presented with this information undermines confidence in the trial verdict. Consequently, the Court finds that the Commonwealth suppressed the drug investigation reports and interviews relating to victim Petrole in violation of *Brady*.

■■■ Second, Petitioner alleges that the Prosecution withheld information indicating that Petrole was rumored to be a government informant. *See* Pet'r's Ex. 57. In an interview with Sgt. Pass on August 20, 2001, Jesse James indicated that he believed Barber killed Petrole due to a rumor that Petrole was a police informant. *Id.* This information was memorialized in a narrative information report. When asked about the report during the habeas proceeding, Prosecutors indicated that they were aware of the statement but did not disclose the information because it was a "rumor" and had not been substantiated by other evidence. Tr. 687; *see* Tr. 59 (Ebert's testimony that he did not recall turning the report over to Petitioner's counsel). This admission, along with the statement's absence from the written *Brady* disclosure, shows suppression of evidence for the purpose of *Brady* analysis. Furthermore, the evidence is favorable to Wolfe because it creates yet another potential motive for Petrole's death that does not involve Wolfe.

Despite being favorable, the Director asserts that the Commonwealth had no obligation to disclose the statement or the report because it was merely an uncorroborated rumor. Director's Proposed Findings of Fact and Law at 24–25. In support of this notion, the Director references the Supreme Court's decision in *Moore v. Illinois*. In *Moore*, the police failed to disclose a police report indicating the outcome of a fruitless investigation of another potential suspect. In affirming the defendant's conviction, the Supreme Court held that failure to disclose an early lead did not violate *Brady* where an eyewitness to the killing and witnesses to defendant's presence at the scene of the crime were later discovered, thus exonerating the other suspect. *Moore v. Illinois*, 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). *Moore* is easily distinguishable from the case at bar because there are neither eyewitnesses to Petrole's murder nor witnesses at the scene of the crime to directly contradict the suppressed evidence or render it clearly immaterial in light of other evidence.

The Director also asserts that the Commonwealth's suppression does not violate *Brady* because James' admission to the police that most of his information was either speculation or from third party sources supports its argument that suppression was acceptable under *Brady*. *See* Pet'r's Ex. 57. Had James' statement about the Petrole rumor been mere fourth-hand speculation as Conway asserts, the Commonwealth may have a stronger argument. However, here, the individual specifically identified the names of the persons from whom he heard the information, thus providing a traceable path to discovering its source. Moreover, as Sgt. Pass testified, the fact that the rumor existed alone, would be enough to "place a target on [the rumored informant's] back." Tr.

543; *see e.g., Wood v. Bartholomew,* 516 U.S. 1, 6, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995). Therefore, the report is material because the fact that the rumor existed may have been probative in value itself and would not qualify as hearsay under the Virginia laws of evidence. *See State Farm Fire and Cas. Co. v. Scott,* 236 Va. 116, 122, 372 S.E.2d 383 (1988) (defining hearsay as "testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of the matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter"). As Sgt. Pass testified, and this Court finds, the value of James' statement that Petrole was rumored to be an informant does not turn on whether the statement is in fact true, but rather the fact that the rumor existed at all would be enough to create an ulterior motive for Petrole's death. Having determined this report/statement to have been suppressed, favorable and material, the Court determines that the Prosecution withheld this information from the Petitioner in violation of *Brady.*

▪ Third, Petitioner alleges that the Prosecution unconstitutionally suppressed witness statements indicating that a second car was at the crime scene shortly after the murder. The habeas inquiry revealed that the Commonwealth was in possession of at least three independent statements from witnesses at the scene of the crime indicating that there was a second car at the crime scene. Both Holly Reid and Peter Shanz stated on the night of the murder that a few minutes after they heard the gunshots, they observed a small dark colored car slowly pass the victim's car and leave the neighborhood. Pet'r's Exs. 35, 36; Tr. 369, 374. At the evidentiary hearing, Mr. Shanz testified that he

spoke with Mr. Conway and related the same statements to him directly. Tr. 376–77. He also testified that he spoke with Conway a few weeks before the trial about testifying, but that Conway never followed up with him. *Id.* Kimberly Miller also made a statement to police on the night of the murder indicating that after the red car left (later found to be J.R. Martin's car), she observed a blue or black vehicle come in, drive to the end of the court, and then leave the area. Pet'r's Ex. 28. During the evidentiary hearing, Ebert admitted that he considered this information in preparing for Petitioner's trial. Yet, none of these statements were included in the written *Brady* disclosures and there is no evidence to suggest that they were provided to Petitioner's counsel. Accordingly, the Court finds that Petitioner only discovered these statements in light of the Court's habeas inquiry.

The statements are favorable to Petitioner because they indicate the possibility that there may have been additional actors involved in Petrole's murder. This notion would not only undermine the Prosecution's theory that Barber acted only at the direction of Wolfe, but it would also refute Barber's trial testimony that only he and Wolfe were involved in the murder for hire scheme. Properly disclosed to competent counsel, this information would have been material when considered alongside other suppressed evidence impeaching Barber's testimony. *See Monroe v. Angelone,* 323 F.3d 286, 300 (4th Cir.2003) (holding that suppressed evidence of witness identities and statements indicating that they saw a suspicious vehicle speeding away from the crime scene at the time of victim's death was favorable to the defendant and ultimately concluding that the prosecution's suppressions violated *Brady* ).[20] The wit-

20. The Court notes that the United States Court of Appeals for the Fourth Circuit fo-

ness statements and identities could have drastically altered Petitioner's trial strategy. Rather than relying primarily on Wolfe's own testimony denying the allegations, competent counsel would have been able to call three additional witnesses present at the scene of the crime to testify that they observed a suspicious second car minutes after hearing the gunshots. This would have enabled Petitioner to establish reasonable doubt by developing a theory that there were other individuals involved in the murder, rather than Wolfe. Therefore, this Court finds that the Commonwealth unconstitutionally suppressed the witness identities and statements regarding a second car at the crime scene in violation of *Brady*.[21]

### 4. *Materiality/Cumulative Effect Analysis*

■■■■■ A finding that certain evidence is exculpatory under *Brady* does not require that each individual piece of evidence be material itself, nor does it require a finding that the evidence proves a specific fact, rather the inquiry specifically requires only that the evidence itself be favorable to the defendant and that the net effect of all of the favorable evidence reasonably undermine confidence in the verdict. *See Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004); *Kyles v. Whitley*, 514 U.S. 419, 435–37, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). In many cases, a court's materiali-

ty analysis determines the disposition of the case. The Director asserts that nearly all of Petitioner's *Brady* allegations fail for lack of materiality. Specifically, the Director argues that there is no reasonable probability of a different trial result in light of the physical evidence presented at trial, mainly Pascquierllo's letter asking Wolfe for money and the telephone records indicating phone calls between Wolfe and Barber surrounding the time of the murder. Director's Proposed Findings of Fact and Conclusions of Law at 26. The Director further posits that Wolfe's trial testimony confirming that Petrole was his drug supplier (J.A. 2170–71), that he arranged a deal with him at Zeuner's house on the night of the murder (J.A. 2082), and that he owed Petrole money (J.A. 2175) indicates that the habeas evidence is immaterial. Additionally, the Director argues that Wolfe's other testimony confirming that he gave Pascquierllo money, gave Martin a discount on drugs after the murder, and admitting that he had a one on one conversation with Barber at the night club after the murder further indicate that none of the suppressed habeas evidence is material. The Court rejects these arguments.

■■■■ First, the physical evidence (i.e., the Pascquierllo letter and the phone records) hardly amount to overwhelming proof that Wolfe and Barber were engaged in a scheme to kill Petrole. *See Kyles v. Whitley*, 514 U.S. 419, 451, 115 S.Ct. 1555,

---

cused its materiality analysis primarily on the impact of the suppressed impeachment evidence regarding the government's key witness in *Monroe*. However, in footnote 60, the court stated that the suppressed witnesses and statements regarding the second car would have further undermined the Commonwealth's case. *Id*. 316, n. 60.

21. The Court notes Petitioner's argument that the Commonwealth suppressed evidence indicating that Jason Coleman owned a blue Ford

Escort at the time of the murder. Had this information been provided to defense counsel, Wolfe could have attempted to establish reasonable doubt by directly implicating Coleman as being involved in the murder. Combined with the trial testimony from several individuals indicating that Barber and Coleman were roommates and had a close relationship, this would have provided Petitioner with a specific argument to further undermine the Prosecution's theory of the case.

131 L.Ed.2d 490 (1995) (concluding that ammunition matching that found in the victim's body, a holster found in the defendant's apartment, and the victim's grocery receipt found on the floorboard of the victim's car with the defendant's fingerprint on it did not qualify as conclusive physical evidence to render the state's evidentiary suppressions as immaterial). Second, all of Wolfe's "admissions" support his testimony that he was acting within the context of the drug conspiracy and had no involvement in Petrole's murder. Therefore, in light of the fact that his testimony supports an alternative theory of the crime and the fact that his admissions were provided within the context of an unequivocal denial of the capital murder scheme, Petitioner's statements do not impede a materiality finding on any of the suppressed evidence. To support the Director's position, this Court would have to make legal findings in contravention of established precedent from both the Supreme Court and the United States Court of Appeals for the Fourth Circuit. Declining to make such findings, this Court concludes that the net effect of the Commonwealth's suppressions reasonably undermined confidence in the jury's guilty verdict for a variety of reasons.[22]

The Commonwealth's capital murder case against Wolfe can best be described as tenuous. A review of the trial proceedings unveiled witness testimony replete with hearsay and speculation. The physical evidence that did exist, mainly the records disclosing the phone call activity between Barber and Wolfe, was circumstantial. As the Court has repeatedly mentioned, the only direct evidence linking Petitioner to the capital murder was the testimony of Owen Barber. In an effort to buttress its case, the Commonwealth presented a series of corroborating witnesses to offer their own conjecture about Wolfe's involvement based either on their own assumptions or the opinions of third-parties (e.g., Jason Coleman and Owen Barber). Nonetheless, Ebert and Conway presented a cohesive depiction of the Commonwealth's theory of the case. Wolfe's testimony was the only evidence that the defense could present to counter the Prosecution's theory of the case. Wolfe testified that he had nothing to do with Petrole's murder. He explained that the circumstantial evidence, such as his private talks and phone conversations with Barber, drug discounts to J.R. Martin and monetary gifts to Jennifer Pascquierllo, related to his drug conspiracy and personal relationships, not a murder scheme.[23] Yet despite these facts, the jury accepted the Prosecution's theory of the case and returned a guilty verdict.

The substance and nature of the suppressed evidence ("habeas evidence") reasonably undermines the Court's confidence in this verdict. The key items of habeas evidence consist of the following:

(1) Barber's relationship with Petrole—confidential informant state-

---

**22.** Having previously discussed the materiality implications of the individual pieces of suppressed evidence, this analysis provides a broad review of the cumulative effect of the Commonwealth's suppressions for the sake of thorough evaluation.

**23.** The trial judge instructed the jury on circumstantial evidence as follows: "when the Commonwealth relies on circumstantial evidence, the circumstances proven must be consistent with guilt and inconsistent with in-

nocence. It is not sufficient that the circumstances proved create a suspicion of guilt, however strong, or even a probability of guilt. The evidence as a whole exclude[s] every reasonable theory of innocence." J.A. 2520. Under this instruction, Wolfe's explanation of the circumstantial evidence reasonably presented a theory of innocence. Therefore, the circumstantial evidence alone would not meet the standard articulated by the trial court.

ments, statement from Jesse James and statement from Randall Ketcham all indicating that Barber knew Petrole. This directly contradicts Barber's testimony that he did not know Petrole as well as the Government's theory of the case;

(2) Barber's ulterior motive for testifying—interview where Det. Newsome implicated Wolfe as the "higher up" and told Barber that turning over Wolfe may be the difference between life and the death penalty;

(3) Barber's admission to Coleman that he acted alone;

(4) J.R. Martin deal—Commonwealth's off the record agreement not to prosecute Martin if he cooperated;

(5) Hough's inconsistent statement—Hough initially stated that he did not remember who made the "do what you have to do" comment when talking to Wolfe and Coleman about hypothetical drug robberies. This was inconsistent with his trial testimony that Wolfe made the statement;

(6) Drug investigation reports—the reports and witness statements indicating that there was a conflict in Petrole's drug enterprise;

(7) Rumor that Petrole was an informant—Jesse James' statement that Petrole was rumored to be an informant; and

(8) Second car witnesses—the identity and statements of three witnesses who told police that they saw a second vehicle approach the area of the crime scene at the time of Petrole's death.

The Commonwealth asked the trial jury to convict Wolfe of capital murder. To find Wolfe guilty, the Commonwealth had to prove each of the following three elements beyond a reasonable doubt: 1) that Owen Barber killed Daniel Petrole; 2) that the killing was willful, deliberate and pre-

meditated; and 3) that the Petitioner hired Owen Barber to kill Daniel Petrole. J.A. 2511. Absent proof of all three elements of the crime, Wolfe could not have been convicted.

Owen Barber's testimony was the only evidence that the Prosecution presented to prove that the Petitioner hired Barber to kill Petrole. *Wolfe v. Johnson,* 565 F.3d 140, 144 (4th Cir.2009). There was no proof of monetary exchange and no physical evidence indicating that the two ever formed a murder-for-hire agreement. Rather, this was a case of one person's word against another. For this reason, the jury had to believe that Barber was credible and that his version of events was in fact truthful and accurate in order to support a conviction. However, the habeas evidence relating to Barber directly undermine not only his credibility but his version of events. Without this evidence, Wolfe could not impeach Barber's credibility as a witness or his version of events. Thus, it deprived Petitioner of any opportunity to counter the one clear piece of direct evidence linking him to the third element of the crime. Had the prosecution complied with its *Brady* obligations, Barber's testimony would have been seriously undermined as it would have established that he had a relationship with the victim, a motive to specifically implicate Wolfe, and that he was inconsistent in his own statements about what happened on the night of the murder.

Applying these principles, courts have awarded habeas relief in situations similar to that presented in this case where the government withheld impeachment evidence on one witness. *See, e.g., Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (awarding new trial because of suppression of impeaching evidence on one witness); *Monroe v. Angelone,* 323 F.3d 286, 316 (4th

Cir.2003) (awarding new trial because of suppression of impeaching evidence on prosecution's key witness); *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 560–61 (4th Cir.1999) (awarding new trial because of suppression of impeaching evidence on one witness); *Crivens v. Roth*, 172 F.3d at 991, 998–99 (7th Cir.1999) (same); *United States v. Service Deli Inc.*, 151 F.3d 938, 944 (9th Cir.1998) (same). Consistent with such precedents, the Court concludes that the suppressed habeas evidence relating to Barber alone is enough to warrant habeas relief under *Brady*.

In addition to the Barber habeas evidence, the Prosecution suppressed other significant impeaching material on the Commonwealth's corroborating witnesses—particularly J.R. Martin and Chad Hough. Having not disclosed the impeaching evidence, the Prosecution was afforded the luxury of presenting corroborating witnesses that were effectively unimpeachable by the Petitioner. Had Martin's agreement not to prosecute and Hough's prior inconsistent statement been disclosed to Wolfe, he would have been able to highlight an important source of bias for Martin and challenge Hough's credibility in front of the jury. Combined with the Barber habeas evidence, this information would have enabled Petitioner to effectively impeach the testimony of three of the Commonwealth's five key witnesses connecting Wolfe to the crime.

Considering the importance of impeaching government witnesses, the cumulative impact of these impeachment suppressions reasonably undermines confidence in the jury's verdict.

The habeas evidence also significantly impacted Wolfe's ability to counter the Commonwealth's theory of the case and present a vigorous defense at trial ("alternate theory habeas evidence"). By suppressing materials relating to the conflicts in Petrole's drug operations and the rumor that Petrole was an informant, the Commonwealth deprived Wolfe of an opportunity to counter the third element of the crime with evidence. Had Wolfe been able to show that other people had potential motives to kill Petrole, this would have allowed the jury in its capacity as fact finder to weigh all of the evidence and information and determine beyond a reasonable doubt, whether Wolfe had hired Petrole. The Commonwealth's suppression of the second car witnesses also deprived Wolfe of an opportunity to challenge Barber's version of events and further undermine the Commonwealth's theory of the case. Instead, the Commonwealth shielded its case from any potential challenges by the defense, thus depriving the jury of critical information regarding potential motives for the crime and depriving Wolfe of an opportunity to present a defense on those grounds.[24] The United States Court of Appeals for

---

**24.** In describing why the Commonwealth's Attorney's Office does not have an open-file policy, Mr. Ebert stated the following at the habeas evidentiary hearing: "**I have found in the past when you have information that is given to certain counsel and certain defendants, they are able to fabricate a defense around what is provided.**" Tr. 110. In effect, Ebert admits here that his contempt of defendants who "fabricate a defense" guides his perspective on disclosing information. This is particularly troubling in the case at bar where the record is replete with statements from Ebert and Conway regarding the

scrutiny and credibility determinations that they made (as opposed to the jury) regarding the relevance of any potential exculpatory evidence. Essentially, in an effort to ensure that no defense would be "fabricated," Ebert and Conway's actions served to deprive Wolfe of any substantive defense in a case where his life would rest on the jury's verdict. The Court finds these actions not only unconstitutional in regards to due process, but abhorrent to the judicial process. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 439–40, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("Unless, in-

the Fourth Circuit has recognized similar suppression efforts as evidence undermining the Prosecution's theory of the case. *See Monroe v. Angelone,* 323 F.3d 286, 296 (4th Cir.2003). Other courts have also acknowledged such suppression conduct as evidence undermining the prosecution's case or as evidence providing the defendant with an alternative defense strategy. *See e.g., Kyles v. Whitley,* 514 U.S. 419, 447, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (noting that Defendant could have used suppressed evidence to outline a vigorous argument attacking the integrity of the police investigation); *D'Ambriosio v. Bagley,* No. 1:00cv2521, 2006 WL 1169926 at *31–33 (N.D.Ohio Mar. 24, 2006) (acknowledging that certain suppressed evidence could have been used to impeach witness testimony and to alter the entire strategy of the defense).[25] Having considered the materials that would have provided an alternate theory for Petrole's death, the Court **FINDS** that this evidence further undermines confidence in the verdict and warrants relief for the Petitioner.

## B. Barber's False Testimony as Grounds for Habeas Relief

On April 22, 2011, Petitioner submitted an additional Motion to Amend the Peti-

tion for a Writ of Habeas Corpus. In this motion, Petitioner adds a supplemental claim asserting that "Wolfe's right to due process of law is violated by the Commonwealth's maintenance of a conviction that rests on material perjured testimony." Am. Pet. for Habeas Corpus, Apr. 22, 2011 at 1. Petitioner rests this claim on the fact that Barber admitted to committing perjury at Wolfe's trial. Aff. of Owen Barber at 5 and 7, contained in App. II to Am. Pet. for Habeas Corpus, Dec. 15, 2005, Ex. 37; Tr. 117–18, 158. In addition to his own admissions under oath, Barber also admitted his perjury to at least three other inmates at Wallens Ridge State Prison (Carl Huff, Allan Rother and Kyle Hulbert). Tr. 118, 120, 122.

The Director opposes Petitioner's Motion on the grounds that Petitioner's assertion: 1) does not state a cognizable constitutional violation for a habeas proceeding; 2) has already been dismissed under *Herrera v. Collins;* and 3) is offered in bad faith and would prejudice the Director. Furthermore, the Director suggests that even if the Court grants Petitioner's Motion, the Amendment would be futile because the United States Court of Appeals for the Fourth Circuit's opinion in *Stock-*

---

deed, the adversary system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when the suppression of evidence has come to portend such an effect on a trial's outcome as to destroy confidence in its result. This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable *piece of evidence* ... [a]nd it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations.").

**25.** Although not precedential in value, the United States District Court for the Northern

District of Ohio provided a more elaborate analysis of this line of *Brady* argument in *D'Ambriosio v. Bagley.* In this case, the district court concluded that the state's suppression of testimony undercutting the state's theory of the murder was inconsistent with its obligations under *Brady. D'Ambriosio v. Bagley,* No. 1:00cv2521, 2006 WL 1169926 at *28 (N.D.Ohio Mar. 24, 2006). In its materiality analysis, the district court then indicated that evidence that would impeach the government's key witness, undercut the state's theory of the case or provide the defense with an alternate defense strategy would have a cumulative impact necessary to constitute a *Brady* violation. *Id.* at *32–33.

*ton v. Virginia,* 852 F.2d 740 (4th Cir. 1988), requires that the government officer have knowledge that the testimony was false in order to prevail on this type of claim.

■ In light of the fact that Barber admitted his perjury after the criminal trial and after Wolfe's original habeas petition, Petitioner's motion is more properly considered as a supplemental pleading under Rule 15(d) of the Federal Rules of Civil Procedure, rather than as an amended pleading under Rules 15(a) or (b). Rule 15(d) states, "the court may . . . permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. . . ." Fed. R.Civ.P. 15(d). The United States Court of Appeals for the Fourth Circuit has stated that "leave [to file supplemental pleadings] should be freely granted, and should be denied only where 'good reason exists . . . such as prejudice to the defendants.' " *Franks v. Ross,* 313 F.3d 184, 198 (4th Cir.2002) (quoting *Walker v. United Parcel Serv.,* 240 F.3d 1268, 1278 (10th Cir.2001)); *see also Laber v. Harvey,* 438 F.3d 404, 428–29 (4th Cir.2006) (analyzing bad faith of the movant, prejudice to the opposing party and futility of the proposed amendment as factors to consider when determining whether to grant leave to amend a filing). The Director asserts that Petitioner's proposed amendment would result in prejudice because Petitioner waited until after the conclusion of the evidentiary hearing to move to amend the petition. Director's Resp. in Opp. to Pet'r's Mot. for Leave to Amend, Apr. 22, 2011, at ¶ 13. More specifically, Director points to the fact that Petitioner moved to amend the petition years after Barber initially recanted by affidavit and months after the conclusion of the evidentiary hearing as evidence of bad faith and prejudice.

■ The Court disagrees with the Director's assertions and finds that the Director suffers no prejudice in allowing Petitioner's supplemental filing. First, Petitioner has asserted the factual basis underlying its supplemental pleading at length in both the Amended Petition for a Writ of Habeas Corpus, dated December 15, 2005, and his Proposed Findings of Fact and Conclusions of Law, filed January 18, 2011. *See* Am. Habeas Corpus Pet., Dec. 15, 2005 at 11–13; Pet'r's Proposed Findings of Facts and Conclusions of Law at 25–27. Consequently, the Director has been well aware of the facts underlying Petitioner's supplemental pleading, despite Petitioner's delay in its filing. Second, Petitioner's only novel contribution through the supplemental pleading is the legal theory on which Petitioner requests relief. Rather than basing his request for habeas relief in a *Herrera v. Collins* innocence claim ("*Herrera* claim") or a *Giglio v. United States* false testimony claim, Petitioner now asserts that Petitioner Wolfe's "right to Due Process of Law under the Fourteenth Amendment to the United States Constitution is violated by maintenance of a conviction for capital murder that, as the Commonwealth now knows, rests on the material perjured testimony of Owen Barber." Am. Habeas Corpus Pet., Apr. 22, 2011. The Director offers several reasons the Court should not substantively consider Petitioner's new legal argument, but it has not provided a meritorious reason the Court should deny Petitioner leave to file its supplemental pleading. Not only is the Director not prejudiced, but there is also no evidence of bad faith by the Petitioner. While Petitioner's motion is admittedly delayed, the delay does not show bad faith, but rather a reluctance to make the legal argument without the aid of

Barber's verbal recantation under oath during the habeas evidentiary hearing. Petitioner's proposed supplemental pleading is not futile. In light of the fact that the Court finds that there is no bad faith, futility or prejudice to the Director in granting Petitioner leave to file a supplemental pleading, Petitioner's motion is **GRANTED.**

█ Having granted Petitioner's Motion, the Court now considers whether to grant habeas relief based on Petitioner's supplemental legal argument. Contrary to the Director's argument, Petitioner's supplemental argument does not simply recast his original *Herrera* claim. Petitioner's *Herrera* claim rested on the notion that it would contravene the Eighth Amendment of the Constitution for a defendant who is factually innocent of a crime to be executed for such offense. *See Wolfe v. Johnson,* 565 F.3d 140, 163 (4th Cir.2009). On initial review, this Court denied the *Herrera* claim because Petitioner failed to meet the extraordinarily high standard and present a "truly persuasive demonstration of actual innocence." *Id.; see Herrera v. Collins,* 506 U.S. 390, 417, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Here, Petitioner has asserted a markedly different claim. Rather than positing that the death sentence is unconstitutional because of actual innocence, Petitioner argues that the maintenance of a conviction based upon false testimony violates due process. The Director attempts to distinguish this assertion from clearly established law indicating that "deliberate deception of [the] court and jury by the presentation of testimony known to be perjured ... is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). However, the facts of this case fail to warrant such distinction. Consequent-

ly, the Court finds that Petitioner's supplemental argument is cognizable in a federal habeas action.

Petitioner acknowledges the Supreme Court's prior rulings that a conviction based on the knowing presentation of false testimony is unconstitutional. *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *id.* In presenting its supplemental argument, the Petitioner suggests that the maintenance of a conviction based on false testimony similarly offends due process irrespective of whether the prosecutor knew of the perjury at the time of the trial. *See Sanders v. Sullivan,* 863 F.2d 218, 225–26 (2d Cir.1988) (holding that the test for granting a new trial based on perjured testimony requires that the recanted testimony be false and material and a probability that the jury would have acquitted defendant). In opposition, the Director asserts that Petitioner's supplemental argument lacks merit based on established precedent from the United States Court of Appeals for the Fourth Circuit because the prosecutors did not know that Barber's testimony was false at the time of the trial. *Stockton v. Virginia,* 852 F.2d at 749. However, the instant case is distinguishable from *Stockton* on several grounds.

█ In *Stockton v. Virginia,* the United States Court of Appeals for the Fourth Circuit affirmed the district court's denial of habeas relief regarding defendant Stockton's murder-for-hire conviction. In that case, Stockton alleged that the district court failed to properly consider new evidence indicating that a key government witness, Randy Bowman, lied in his testimony about the murder-for-hire scheme. During trial, Bowman testified that he was present when Stockton agreed to commit the murder in exchange for $1,500. In the related habeas petition, Stockton alleged that an affidavit of Bowman's cell mate,

Frank Cox, stating that Bowman told him (Cox) that he had lied during his trial testimony should have been considered as grounds for habeas relief. *See id.* at 749. The United States Court of Appeals for the Fourth Circuit affirmed the district court's denial of Stockton's habeas petition stating that the mere existence of new evidence was not enough to grant relief, but rather that the evidence must bear upon the constitutionality of the applicant's detention. *Id.* (quoting *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)). In doing so, they articulated a narrow ground for habeas relief based on newly discovered evidence. It ruled:

> When public officers connive at or knowingly acquiesce in the use of perjured evidence, their misconduct denies a defendant due process of law. Recantation of testimony alone, however, is insufficient to set aside a conviction on the ground that the due process clause has been violated. A habeas corpus petitioner must show that the prosecutor or other government officers knew the testimony in question was false in order to prevail.

*Id.* (citing *Thompson v. Garrison,* 516 F.2d 986, 988 (4th Cir.1975)). Although narrow in scope, *Stockton* articulates a standard for relief that focuses on public officer misconduct and the denial of due process. This standard is further supported by the

fact that United States Court of Appeals for the Fourth Circuit also considered whether Stockton had alleged prosecutorial misconduct with respect to Bowman's testimony;[26] the extent to which the evidence would have brought about a different trial result; and, its admissibility at trial in deciding whether to grant habeas relief on that ground.[27] *Id.* It is within this context that the United States Court of Appeals for the Fourth Circuit indicated that a habeas petitioner must show that the government officer had knowledge of the false testimony in order to prevail. Hence, the knowledge requirement stands as a clear example of the "conniving and knowingly acquiesc[ent]" behavior that results in a denial of due process of law.

■ In this case, the Court is confronted with a credible recantation by the Commonwealth's only witness with direct knowledge of the murder-for-hire scheme. On November 2, 2010, Barber recanted his trial testimony while under oath before this Court. Tr. 117–18 (containing Barber's habeas testimony that Petitioner was not involved in the murder of Daniel Petrole and that Petitioner did not hire Barber to kill Petrole); *see* Tr. 159–60 (containing a verbal exchange between the Court and Barber, where Barber confirms his recantation of the trial testimony). The Court finds Barber's demeanor and candor persuasive. Barber not only re-

**26.** While Petitioner has not made explicit allegations of prosecutorial misconduct in its supplemental pleading, this Court's factual findings and legal conclusions indicate that Ebert and Conway acted in contravention of the 1999 Virginia Code of Professional Responsibility, DR 8–102(A)(4), available at, http://www.vsb.org/profguides/1999/codeprof.html. DR 8–102(A)(4) states: "A public prosecutor or government lawyer in criminal litigation shall ... make timely disclosures to counsel for the defendant, or to the defendant if he has no counsel, of the existence of evidence, known to the prosecutor or other government

lawyer, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment." This rule is currently memorialized as Rule 3.8(d) in the Virginia Rules of Professional Conduct.

**27.** These additional analytical considerations mirror those that courts must consider in determining a violation of due process under *Brady v. Maryland.* This further supports the Court's conclusion that habeas relief based on perjured testimony turns on the denial of due process for the defendant.

canted in an affidavit submitted by himself, but he provided consistent statements recanting his trial testimony under oath in open court.[28] Therefore, unlike the facts presented in *Stockton,* this Court considers direct (and admissible) testimony from the witness that would likely have impacted the outcome of the trial. Also, unlike the public officials in *Stockton,* the Prosecution cannot clearly claim that they were unaware of the falsities in Barber's testimony in light of the exculpatory information in its possession at the time of the trial. As previously discussed, the Prosecution was in possession of multiple sources of information indicating that Barber had a relationship with Petrole. Rather than addressing the information in its possession (some of which included first hand witness statements about Petrole and Barber's interactions), the Commonwealth suppressed it, thereby stifling any effort to determine the truthfulness of Barber's statements. Had the Commonwealth pursued the statements regarding Barber and Petrole's relationship, it would have discovered the falsity in Barber's testimony that he did not know Petrole. Second, the Commonwealth was in possession of information indicating that Barber told Coleman that he acted alone in murdering Petrole. This statement further provided the Commonwealth with notice that Barber's trial testimony implicating

Wolfe was false.[29] Finally, Commonwealth Attorney Ebert testified at the habeas evidentiary hearing that he employs a practice of withholding information from counsel and defendants with the intent of preventing them from establishing a defense around what the information provides. *See* Tr. 110. This statement shows the Commonwealth's intent in withholding exculpatory information as well as its knowledge about the consequences of suppressing and failing to pursue such evidence. Not only was the Commonwealth in possession of information that would have revealed falsities in Barber's testimony at the time of the trial, it also knew that suppressing that information would result in denying Petitioner an opportunity to craft a defense based on the information. Therefore, this Court concludes that the Prosecution used Barber's testimony despite being on notice that it contained falsities. *See Stockton v. Virginia,* 852 F.2d 740, 749 (4th Cir.1988).[30]

These facts, combined with the Prosecution's failure to conduct a proper examination into the drug investigation further exhibit the ways in which the Commonwealth stifled a vigorous truth-seeking process in this criminal case. They had prior knowledge of falsities in Barber's testimony, yet never pursued or investigated the information. In light of the Com-

---

**28.** Not only does Barber's recantation align with other suppressed evidence in this case, but it is also supported by the affidavits of three individuals whom he confided in while imprisoned.

**29.** Ebert denies that Coleman told him about Barber's "acted alone" statement. However, the Court finds Ebert's denial to lack credibility in light of his various meetings with Coleman and his unconventional approach to discovery procedures, particularly in regards to impeaching evidence and information which might contradict the Commonwealth's theory of the case.

**30.** The Court distinguishes its finding from cases where a prosecutor presents evidence that they personally believe is false or doubt in accuracy, without any basis for finding that the testimony actually was or is false. *See e.g., Hoke v. Netherland,* 92 F.3d 1350, 1360 (4th Cir.1996) (concluding that the prosecutor's belief that part of a witness' testimony is false absent any evidence or information in the record suggesting the same does not establish that he suborned perjury).

monwealth's conduct, the Commonwealth cannot be entitled to benefit from their deliberate ignorance of and/or reckless disregard for the falsities in Barber's testimony. Consequently, the Court **FINDS** that the Commonwealth violated Wolfe's due process rights by presenting Barber's trial testimony despite having information in its possession indicating that the testimony was false.

█ In addition to requesting relief based on Barber's false testimony in its April 22 Amendment to Petition for a Writ of Habeas Corpus, Petitioner also submits Barber's false testimony as a factual basis for a claim of relief under *Giglio v. United States*. Pet'r's Proposed Findings of Facts and Conclusions of Law at 25–26. The Commonwealth was in possession of information indicating that Barber knew Petrole and that Barber stated that he acted alone, yet, it allowed Barber's testimony that he did not know Petrole and that Wolfe hired him to commit the murder to go uncorrected. As the Court has repeatedly indicated, Barber's testimony was critical to Wolfe's criminal trial because it was the only evidence establishing the murder for hire element of the charge. Therefore, knowledge that aspects of Barber's testimony were false is material because it undermines confidence in the jury's guilty verdict. Furthermore, the Supreme Court has articulated that suppression of credibility evidence when the reliability of the witness is determinative of guilt or innocence falls within the *Giglio* and *Napue v. Illinois* rule for due process violations. *Giglio*, 405 U.S. 150, 154, 92 S.Ct. 763 (1972); *see Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). At the very least, this Court's factual findings indicate that the Commonwealth withheld credibility evidence relating to Barber. In light of the fact that the Government would not have been able to prove the third element of capital murder in this case without Barber's testimony, the Commonwealth's suppression of the credibility evidence and allowance of Barber's false testimony contravene Wolfe's constitutional rights under *Giglio v. United States* and *Napue v. Illinois*.

## C. Venireman Claim under *Witherspoon v. Illinois*

Petitioner alleges that the trial court deprived him of his right to an impartial jury by striking a qualified venireman for cause based on his views regarding the application of capital punishment. Am. Pet. for Habeas Corpus, Dec. 15, 2005 at 45. During the *voir dire*, both the prosecution and defense counsel questioned venireman, Robert Mock, on his ability to impose the death penalty in certain cases. The relevant excerpts of the colloquy are provided as follows: [31]

> Mr. Ebert: ... Could you impose the death penalty on the person who hired the person to do the killing even though the person who did the killing may or may not receive the death penalty?
>
> Mr. Mock: (shaking head.)
>
> Mr. Ebert: You could or could not?
>
> Mr. Mock: Could not.
>
> ...
>
> Mr. Ebert: So you absolutely could not impose the death penalty in that certain case?
>
> Mr. Mock: I don't think so
>
> Mr. Ebert: You realize there may be different facts concerning each instance?
>
> Mr. Mock: No, I couldn't.
>
> ...
>
> Mr. Partridge: Is there a set of facts that could be presented to you ... or

---

**31.** Mr. Ebert conducted the *voir dire* questioning for Mr. Mock on behalf of the Commonwealth of Virginia and Mr. Partridge conducted the questioning on behalf of Petitioner.

would there be circumstances where you could impose it?

Mr. Mock: Yes, there could be circumstances where I could.

Mr. Partridge: Would you follow the law?

Mr. Mock: Sure, Yeah.

Mr. Partridge: And you would weigh the evidence that you hear over the next few days and come to your own determination then?

Mr. Mock: Yeah.

Mr. Partridge: ... [I]f you are selected to be a juror, you don't have any preconceived notions about what the facts are?

Mr. Mock: No.

Mr. Partridge: And you'll listen to the facts subjectively? [32]

Mr. Mock: Yes.

J.A. 910–11, 918; *see generally* J.A. 910–933. Later in the *voir dire*, Mr. Partridge moved to strike Mock from the jury panel on the grounds that he indicated that he could not impose the death penalty for the hirer in a murder for hire scheme if the trigger man did not also receive it.[33] J.A. 932. The trial court struck Mock from the jury panel and Petitioner now challenges his dismissal as a violation of his constitutional right to an impartial jury.

 An impartial jury consists of jurors who will conscientiously apply the law and find the facts. In a capital case, a venireman may be excused for cause based on his or her views on capital punishment if such views would "prevent or substan-

tially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). It is the trial judge's duty to determine whether a particular venireman may be dismissed for cause due to a lack of impartiality and such determinations are considered factual findings for the purpose of § 2254 review. *Id.* at 423, 429, 105 S.Ct. 844.

 While Mock initially made statements indicating that he could not impose the death penalty in a particular situation, irrespective of the facts of the case, the totality of Mock's *voir dire* testimony indicated that he would obey the court's instructions and come to a determination after weighing the evidence presented in the case. Once the defense counsel clarified Mock's *voir dire* testimony by asking specifically about his ability to objectively review the evidence and follow the law, neither the trial judge nor the Prosecution propounded additional questions to Mock about his qualifications. Therefore, no evidence exists to discredit Mock's clear testimony that he would follow the law and make a determination based on the facts of the case. In situations where the totality of a venireman's *voir dire* testimony indicate that the juror would objectively listen to the facts and make a determination on the appropriate sentence based on the evidence presented in the case, that venireman is considered qualified to serve as a juror. *See e.g., Ivey v. Ozmint,* 304 Fed.

---

**32.** While the Court accurately quotes Mr. Partridge in his use of the word "subjectively," the context of his colloquy with venireman Mock suggests that he mis-spoke in using the word "subjectively" as opposed to "objectively."

**33.** Mr. Partridge did not move for exclusion on the basis of bias. Had he done so, Partridge as the adversary seeking exclusion, would have needed to demonstrate that Mock

lacked impartiality. *Wainwright,* 469 U.S. 412 at 423, 105 S.Ct. 844 (citing *Reynolds v. United States,* 98 U.S. 145, 157, 25 L.Ed. 244 (1879)). Rather, Mock's dismissal was premised on his views about capital punishment, and there is clear established federal law limiting the state's power to exclude on this basis. *See id.; see also Adams v. Texas,* 448 U.S. 38, 47–48, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

Appx. 144, 148 (4th Cir.2008). Under these facts, the Court **FINDS** that the trial court's decision to strike Mock was contrary to clearly established federal law as articulated *Witherspoon v. Illinois* and *Wainwright v. Witt* because Mock's *voir dire* testimony did not unveil a perspective that would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. On these grounds, Petitioner's death penalty sentence cannot stand. *See Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976) (per curiam).

## V. CONCLUSION

The Court **FINDS** that Wolfe was denied the right to due process pursuant to the Fourteenth Amendment as interpreted in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to be apprised of all material, exculpatory information within the hands of the prosecution. Petitioner's motion for leave to amend the habeas petition is **GRANTED,** and the Court **FINDS** that the Commonwealth's use of Barber's false testimony is also grounds for habeas relief under both *Stockton v. Virginia* and *Giglio v. United States.* Finally, Petitioner's habeas petition for relief on the ground that he was denied his Sixth Amendment right to an impartial jury is **GRANTED.**

Accordingly, Wolfe's petition for a writ of habeas corpus is **GRANTED** and his conviction and sentence are **VACATED.** The case is remanded to the Supreme Court of Virginia for further proceedings not inconsistent with this opinion.

The Clerk is **DIRECTED** to send a copy of this Order to the parties and counsel of record.

**IT IS SO ORDERED.**